## A. B. DICK CO. v. MARR.

United States District Court
S. D. New York.
Dec. 8, 1950.

See also, D.C., 9 F.R.D. 99.

H. G. Morison, Asst. Atty. Gen., R. C. Hackley, Jr. and Melville D. Church, Sp. Asst. to the Atty. Gen., for United States of America, amicus curiae (G. Murray Paddack, Attorney, Department of Justice, Washington, D. C., of counsel).

MEDINA, District Judge.

This proceeding is unusual but not unique. Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514. On April 7, 1922, application was filed in the Patent Office and on February 17, 1925 there issued Patent No. 1,526,982, known in the litigation which followed as the Hill patent. Almost immediately thereafter the A. B. Dick Company, to whom the patent was assigned, commenced a number of actions for infringement. On August 7, 1929, the present action was commenced and the case was tried before Judge Patterson in April, 1932, resulting in the granting of an injunction and the appointment of a Special Master. The report was not filed until October 8, 1941. After certain further proceedings before Judge Hulbert, final judgment was entered against the defendant on October 2, 1943, and this judgment was unanimously affirmed on June 26, 1946, by the Circuit Court of Appeals for the Second Circuit. 155 F.2d 923.

On July 22, 1946, an indictment under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, was returned in the United States District Court for the Northern District of Ohio, Eastern Division, against the Dick Company and others and, on the same day, a civil complaint was filed. In these proceedings one of the charges was in substance that the Dick Company had made certain contracts and had certain dealings with Harry E. Smith and Joseph W. Rowe and the companies controlled by them and that there had been concealment and withholding of evidence of prior art by Smith and Rowe, all of which amounted to a suppression of evidence of prior art, as a result of which the Hill patent was held to be valid.

Accordingly, when application was made by the defendant herein to the Supreme Court for certiorari, the Solicitor General

Byerly, Townsend & Watson, New York City, for plaintiff (Robert W. Byerly, New York City, Charles A. Horsky, Washington, D. C., John T. Haslett, Chicago, Ill., Ralph M. Watson, New York City, Wilbur R. Lester and Kathleen E. Godfrey, Washington, D. C., of counsel).

Edward D. Bolton, New York City, for defendant.

as amicus curiae submitted the suggestion that, if these allegations should be established on the trial of the issues in the then pending proceedings under the Sherman Act, it might well appear that the judgment obtained against Marr by the Dick Company was a result of the adjudication of validity of the Hill patent in prior cases which, but for the alleged suppression of evidence of prior use, might have been decided differently, in which event the judgment which was the subject of the certiorari application would be tainted by fraud. Upon the basis of this suggestion the Supreme Court, 329 U.S. 680, 67 S.Ct. 188, 91 L.Ed. 599, vacated the judgment and remanded for consideration of the question: "Whether respondent's (the Dick Company's) prosecution of the instant case may not constitute a fraud upon the courts." This is the question which has been tried out before me, the Circuit Court of Appeals having ordered the case remanded to the District Court for consideration of the question formulated by the Supreme Court.

On March 25, 1948, the District Court for the Northern District of Ohio, Eastern Division, entered a consent decree in the civil anti-trust case and on the following day accepted a plea of nolo contendere and imposed certain fines in the criminal proceeding. On November 22, 1948, the Department of Justice presented before Chief Judge Knox the "Notice of Issue and Facts Bearing Thereon To Be Presented By United States, Amicus Curiae" and an order was made authorizing those designated by the Attorney General to represent the government as amicus curiae to present the evidence; and in due course the case was assigned to me for trial. Counsel for the Dick Company and James Marr were present throughout the trial, which was conducted at all times as an adversary proceeding.

The charges fall into three separate categories. First, certain statements made by counsel for the Dick Company at various stages of the prosecution of several patent cases pending in various courts, which are alleged to have been made to deceive those courts and for the purpose of concealing and suppressing evidence of relevant and material facts. Second, the suppression or attempted suppression of evidence by the Dick Company and its counsel on the one hand, and Smith and Rowe and their respective attorneys on the other, by means of certain contracts hereinafter described in some detail and by certain acts and conduct, including the giving of allegedly false and perjurious answers to interrogatories and to questions put to the various participants during the taking of their depositions. Third, a conspiracy to suppress evidence, which is evidently asserted in order to obtain such advantage as might accrue from the rule making declarations by a co-conspirator admissible in evidence.

Because of the serious character of these allegations and the obvious importance of ferreting out any actual or attempted corruption of the judicial process I have given the broadest possible construction to the question formulated by the Supreme Court. A "Notice of Supplemental Issue and Facts Bearing Thereon" has been received; numerous miscellaneous claims of wrongdoing not originally relied upon have been asserted and the evidence relative thereto received and considered. While the trial has consumed over two months of the time of the court and the transcript and the exhibits make a record of formidable proportions, it seemed better to have it so and thus make every effort to dispose of the entire matter once and for all time, particularly as these charges in one form or another have been asserted and reasserted in the pleadings interposed in a number of actions pending in various courts over the past twenty odd years, as will more fully appear later on in this opinion. Suffice it to say that every effort has been made effectively and thoroughly to explore and investigate the entire matter from beginning to end.

The controversy revolves around the work of two men, each of whom had done considerable experimentation in the field of stencil sheets. "A stencil sheet is a sheet adapted to be converted into a stencil for multiplying copies with less equipment than by printing, particularly in machines which position the paper and sten-

cil and apply ink, so that it passes through the apertures in the stencil and reaches the paper." A. B. Dick Co. v. Simplicator Corporation, 2 Cir., 1929, 34 F.2d 935, 936. These men were: Harry E. Smith, who is said to have been one of the chief participants in the alleged fraud, a manufacturer and seller of stencil sheets and duplicating supplies, whom the Dick Company had repeatedly and successfully sued as an infringer over the years; and Father Edward J. Calhoun, a priest connected with Loyola University in Chicago, Illinois, a teacher of chemistry who had for a long time produced various sorts of stencil sheets, for the principal purpose of making inexpensively a sufficient number of copies of notes and examination papers for his classes.

As the application for the Hill patent was filed on April 7, 1922, it was necessary for anyone relying upon a prior use as an absolute defense to establish, by evidence measuring up to the strict standard of proofs required for such defenses, that the work relied upon as a prior use had been done prior to April 7, 1920, under the state of the law as it was when the events which now concern us transpired.

For many years the Dick Company had dominated the stencil field; originally through its ownership of the Broderick patent, No. 377,706, issued on February 7, 1888, which had to do with a wax stencil sheet formed on Yoshino paper, then produced only in Japan, and later by reason of the Fuller patents, Nos. 1,101,268 and 1,101,269, on the process and the product respectively, which referred to a stencil sheet of Yoshino paper impregnated with a protein, such as gelatine. This was called Dermatype. This type of stencil sheet, which appeared on the market in 1912 or thereabouts, had one serious defect. It soon became too hard to cut without moistening and this moistening caused difficulties. For example, the sheet was of different consistencies which were the result of evaporation as the typewriting of the sheet progressed, resulting in uneven work, and the moistening caused the typewriter to rust. It was apparent to everyone interested in the subject, commercially or otherwise, that a dry stencil would be a great improvement. It was this very dry stencil that was the subject matter of the Hill invention which was set forth in Patent No. 1,526,982. It was tough, durable, no moistening was necessary, it was not subject to temperature changes and it retained its properties for eighteen months to two years, the period stated to be necessary to meet the demands of the trade. The Dick Company called the Hill stencil sheets Mimeotype and put them on the market in January, 1924. The reaction of the public was immediate and lasting. The sales of Mimeotype stencil sheets constituted 3% of the Dick Company's sales of stencil sheets in the first half of 1924 and 44% in the second half.

As it will become of significance later on, it may be well at this point to set forth two of the broad claims of the Hill patent, which are as follows:

"2. A stencil-sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising a base having a type-impressible coating including a cellulose compound and a tempering agent.

"18. A stencil-sheet adapted for conversion into a stencil by the impact of type and the like thereon, the same comprising an open-texture base having a coating including a cellulose ester and a tempering agent."

In the meantime, that is to say prior to 1924, Smith, who is said to have invented a satisfactory dry stencil in 1913-1914-1915, had been marketing his Hesco blue stencil which was a wet stencil made of coagulated protein, all of which resulted in a judgment in 1922 in favor of the Dick Company against Smith for infringement of one of the Fuller patents. This is of the utmost significance as Smith was a practical man and understood only too well the importance of a dry stencil sheet. If he had really invented one during the period of his experimentation in 1913, 1914 and 1915, he would undoubtedly have put it on the market as soon as his Cellit L was again available after the conclusion of World War I. Despite his long record

of persistent and ingenious infringement, it is scarcely to be supposed that he could have invented an entirely new and practical dry stencil sheet without at once exploiting it commercially.

The proofs indicate that the Dick Company knew of Smith's early work and also knew that nothing had come of it. The Dick Company also knew that he was manufacturing and selling a wet stencil of coagulated protein, as it sued him as an infringer for doing so, just as it sued him again later for the manufacture and sale of a slightly different type of wet stencil sheet. This background with respect to Smith and his alleged prior use would make it seem improbable that there ever was any dry stencil produced by Smith prior to April 7, 1920, or at any time, which constituted a prior use, evidence of which the Dick Company might desire to suppress. While it is true that, many years later, when the Dick Company was again suing Smith or his distributor as an infringer of the Hill dry stencil sheet patent, Smith issued notices to the trade stating "Our rights to the use of Hesco Dry Stencils were established during 1913–1914, and the present product is manufactured in accordance with the product of twelve years ago." But it was the testimony of Smith in the Arlac case, to be discussed infra, that his early experiments had not been successful and that they had been abandoned, and such was his testimony before me. In view of Smith's persistent infringement by means of one or another type of wet stencil long after he was supposed to have invented a dry stencil, it is hard to see how the facts could have been other than as testified by him.

The early work of Father Calhoun presents an entirely different picture. When he testified in the Simplicator case, discussed infra, in 1928, he was 54 years old and had since as early as 1913 been interested in experimenting with nitro-cellulose in stencil sheets as a sort of hobby and for the practical purpose of aiding the preparation of notes and examination papers for himself and his colleagues to be used at Loyola. He conducted numerous experiments using nitro-cellulose or pyroxylin as a base for his "stencil dope" with a great variety of solvents. His "stencil dope" seems to have varied almost from day to day as he was fascinated with the work and was always using something new. At the time of the alleged suppression or attempted suppression of evidence none but he could have known what bottles of "dope" or what quantities of stencil sheets had been preserved by him as vestiges of his early work. Nor is there any reason to suppose that anyone but he had knowledge of his formulae and such records as he might have made and kept in his possession.

Rowe had heard of Father Calhoun's work and visited him some time in 1925, after the Dick Company had sued Rowe's distributor Barnett for infringement of the Hill patent; and Father Calhoun testified in his deposition read in the Simplicator case that in 1925, evidently on October 22, and after Rowe's visit, that Samuel O. Edmonds, counsel for the Dick Company, and Davis, a consulting chemist in the employ of the Dick Company, came to see him and he prepared one of his stencils in their presence and told them that he had promised Rowe he would certify that he had made stencil sheets of a cellulose compound prior to the issuance of the Hill patent. He testified that his interview with these representatives of the Dick Company was a pleasant one, that there was some discussion of his thinking of exploiting his work commercially, and that the interview closed with some remark by Edmonds to the effect that "if you have anything hereafter, why, it might be a good thing for you to remember us."

Many of Father Calhoun's stencil sheets were produced and placed in evidence in the Simplicator case, but none made by him during the prior art period. It is likely that what Edmonds and Davis observed on the occasion of their visit was significant; but it is extremely unlikely that Father Calhoun told them anything of the ingredients of his "stencil dope," save that it contained some nitro-cellulose, or anything about his files of old stencils, his records, memoranda and so on. Indeed, his testimony in the Simplicator case would

make it appear that at the time of this visit in 1925 and later he did not himself know what he had or had not preserved. Here again, as in the case of Smith but for different reasons, the background of the Calhoun prior use makes it seem improbable that it should ever have occurred to counsel for the Dick Company or to anyone else that Rowe had some personal knowledge, or the possession of some article, the suppression of which might serve to prevent the truth with respect to Father Calhoun's work from coming to light.

In accordance with what seems to be standard practice the Dick Company proceeded with expedition and dispatch immediately after the issuance of the Hill patent on February 17, 1925. Smith and Rowe were evidently the principal manufacturers of domestic stencil sheets in competition with those of the Dick Company and Simplicator of New York and Arlac of Pittsburgh were marketing stencil sheets manufactured abroad. Complaints were filed against Hesco Products, Inc., Smith's distributor, and Barnett, Rowe's dealer, on May 12 and May 15, 1925, respectively. A complaint against Simplicator was filed on June 18, 1925. Attempts to get jurisdiction over other Arlac dealers were unsuccessful, and it was not until July 26, 1929, that the proceedings which led to the trial of the case against Arlac Dry Stencil Corp. were commenced in Pittsburgh. The present case against Marr Duplicator Company, the defendant herein, was not commenced until August 7, 1929, although certain proceedings were had against a company of the same or an almost identical name in California. The complaint against Heyer Duplicator Co. was filed in Chicago on August 26, 1929.

Much is made of the manoeuvres of counsel for the Dick Company: in failing to press certain of these cases; in bringing on for trial first the Simplicator case, where the pleadings failed to rely upon the Smith and Father Calhoun prior uses, although on November 18, 1927, some months prior to the trial, counsel for Simplicator gave notice that the Father Calhoun prior use would be, and it subsequently was, asserted as a defense; in failing

to insist that an answer be filed in the action against Barnett, and in making no opposition to the dismissal of this action without prejudice on January 28, 1927, for what amounted to a failure to prosecute; in submitting on July 20, 1927, evidently as part of the settlement hereinafter described, to Senior District Judge Knox, as administrative head of the court, an order on consent which he signed, permitting the physical withdrawal from the files of the answer and amended answer in the action against Hesco Products, Inc., which asserted the Smith and Calhoun prior uses by way of defense; and so on. It would be a tedious and unprofitable task to outline the reasons given in support of the contention that these were but a succession of steps in the consummation of a conspiracy to suppress evidence, on the one hand, and the explanations given by counsel for the Dick Company, and by some of the witnesses, on the other. Suffice it to say that I find nothing sinister and no wrongdoing or evil intent in any of these manoeuvres. Patent litigation is necessarily a technical affair, in which competent counsel must concern themselves with problems of jurisdiction and with many practical considerations as well. It is easy in retrospect to attribute evil motives to those who advise procedural steps, taken in what may sometimes be an excess of caution. The public records of the Patent Office necessarily revealed data concerning every court action involving the Hill patent, and they disclosed the pendency of the action against Hesco, where the answer and amended answer had been open to the scrutiny of any interested persons for upwards of a year and a half after the filing of the amended answer; and a copy of the answer had already been made for counsel in at least one of the cases above enumerated. It is well to bear in mind that the litigation over the validity of the Hill patent was fought on either side by patent lawyers thoroughly conversant with the tools of their profession.

According to the theory of the amicus, it was some time shortly after the commencement of the actions against Hesco and Barnett that counsel for the Dick Com-

pany conceived the idea of suppressing evidence of the prior use of Smith and Father Calhoun and that this idea led to the agreements with Smith and Rowe and the later attempts to conceal their contents from the courts. Some of the lawyers involved, such as Samuel O. Edmonds and Archibald Cox who successively represented the Dick Company, were men of conspicuous standing and excellent reputation at the patent bar, others, such as E. Clarkson Seward, who represented Smith, and J. Clifford McChristie, who represented Rowe, were, so far as appears in the proofs before me, likewise men of integrity and unsullied reputation. Before this trial all but Seward had passed on; the lapse of from twenty to twenty-five years had dimmed the recollection of Smith and especially that of Rowe, who had not the advantage of an intermediate refreshing of his recollection during the grand jury proceedings in Cleveland, as it was mistakenly thought that he had died. A. B. Dick, Sr., supposedly one of the master minds in the alleged conspiracy, died in 1934, and Father Calhoun in 1948.

Shortly after the commencement of the action against Hesco in May of 1925, Seward commenced a series of negotiations with Edmonds in which there was much discussion of the Smith and Calhoun prior uses and of the possibility of the Dick Company buying Smith out. Smith's asking price struck Edmonds as unduly inflated and there was little to indicate that he was much impressed by the alleged prior uses. In any event, matters had progressed to the point where the depositions relative to the Calhoun prior use were about to be taken when Edmonds died and Archibald Cox was substituted as attorney for the Dick Company on February 16, 1927. Both Seward and Smith impressed me favorably as witnesses and they outlined what they recalled of the part each had in the negotiations which led to the settlement. I find that at no time during these negotiations was it the intent or purpose of any of the participants to suppress or attempt to suppress evidence of the Smith or Calhoun alleged prior uses, or to suppress or attempt to suppress evidence of any character whatsoever. The contingent feature was suggested only after considerable negotiation in a final effort to bring about a meeting of the minds, as the parties were then only $10,000 apart. The periodical payments, hereinafter described, were provided for at the suggestion of Seward, who doubtless had the income tax in mind and did not wish Smith to receive in a single year the entire sum or such part thereof as was not contingent.

The negotiations with McChristie, who was acting for Rowe, followed an entirely different pattern, although the result was much the same. In each case the Dick Company and those who represented it were motivated throughout by the desire to buy out a potential competitor and by legitimate considerations, save in so far as these transactions might, together with others, constitute violations of the anti-trust laws. Here again I find that at no time during these negotiations with McChristie and Rowe was it the intent or purpose of any of the participants to suppress or attempt to suppress evidence of the Smith or Calhoun alleged prior uses or to suppress or attempt to suppress evidence of any character whatsoever.

The first agreement is between the Dick Company, referred to in the agreement as the Patentee, The H. E. Smith Company, and Harry E. Smith, and was made on July 21, 1927. It sets forth by way of recital, the nature of the business of the Dick Company and of the Smith Company; the large number of patents covering inventions connected with duplicating machines and supplies owned by the Dick Company, including a specific reference to the Hill patent; that differences had "continually" arisen between the contracting parties relating to the infringement of the Dick Company's patents, with specific reference to the Hesco and Smith Company suits brought by the Dick Company, which were then pending; and continues:

"After many years of litigation, expense and diversion of effort connected with patents, as above in part indicated, the parties now desire permanently to end all such wrongs or disputes."

The agreement then provided that the parties thereto agree as follows: (1) the litigation then pending shall be terminated by the entry of a consent decree holding the Hill patent valid and infringed; (2) the Smith Company and Smith agree to "* * * turn over to the Patentee all in-infringing sheets and material therefor * * *" in their possession; (3) the Smith Company and Smith agree "* * * loyally to cooperate with the Patentee in securing to it the fullest benefit and enjoyment of its rights under said Hill patent and decrees, and to that end to sign an announcement in the form hereto attached, of their acknowledgment of the validity, and their discontinuance of the infringement, of said Hill patent * * *" and to provide the Dick Company with a list of customers to whom Smith or the Smith Company have sold infringing stencils, so that the Dick Company may send the announcement to them; (4) the Smith Company and Smith agree "* * * to turn over to the Patentee all papers and all information in the possession of either of them in any wise relating to the stencil sheets for any duplicating machine (other than addressing machines) heretofore made or sold by them or either of them or others; * * *" and to assign to the Dick Company all patent applications, assignments and other papers dealing with patentable subject-matter; (5) the Smith Company and Smith admit the validity of the Hill patent and agree not to make or sell "directly or indirectly" any stencils which contain a coating including any cellulose compound or derivative during the life of the patent or to assist others to do so; (6) the Smith Company and Smith agree not to make or sell "directly or indirectly" any duplicating machine or part thereof or supply therefor which may infringe any of the patents of the Dick Company. The words "directly or indirectly" are broadly defined so as to include "* * * taking any part whatsoever in any such manufacture or sale * * *" including the giving of information or advice; the words "which may infringe," and "any supply for duplicating machines" are also defined— the former as including anything "* * *

falling within the broadest interpretation or construction of any claim * * *" the latter as "* * * any stencil sheet or ink or interleaf or other thing used in operating, or any part or accessory of, any duplicating machine"; a proviso is added excepting addressing machines from the application of this article (6), and providing that, as to supplies for addressing machines, the rights of the parties are not to be affected by this article (6); (7) the Smith Company and Smith agree not to make or sell directly or indirectly any stencil sheet, during the life of the Hill patent, "* * * usable on any duplicating machine (other than addressing machine), comprising, * * *, any derivative of cellulose or cellulose compound or any glycerine or protein substance whatsoever, * * *" without the written consent of the Dick Company, obtained in advance; (8) the Smith Company and Smith agree to supply a specimen and complete description of any supply for a duplicating machine which they intend to produce commercially and offer for sale, other than supplies for addressing machines, to the Dick Company prior to its production or marketing so that the Dick Company may "* * * direct attention to any of its patents infringed thereby, * * *" and any manufacture or offer for sale of such product by the Smith Company or Smith without such submission shall constitute a breach of the agreement entitling the Dick Company to injunctive relief, damages, and reasonable attorney's fees.

The Dick Company promises in Article 9: (a) to release the Smith Company and Smith from all liability by reason of past infringements of the Hill patent; (b) to deliver a check for $90,000 to the Merchants Trust Company, of Newark, New Jersey, in accordance with another agreement between Smith, the Dick Company, and the Bank, which is discussed below; and (c) to pay the additional sum of $10,000 to Smith on January 15, 1931 "* * * unless at that time the broad claims of said Hill patent * * * shall have been held invalid by a Court of last resort upon the ground of a prior use * * *", provided that if no decision by a Court of last re-

sort has been rendered on that date, but the Dick Company has diligently prosecuted a suit in order to obtain such a judgment, the payment "* * * of such Ten thousand dollars ($10,000) shall await the decision of said Court. The provisions of this paragraph (c) shall affect only the amount of payment under this article 9 and shall not in any way affect any other article, provision or clause of this agreement."

Article 10 sets forth administrative provisions. The effective date of the contract is set as August 31, 1927 unless some other date is agreed on; it is agreed that Smith and his Company shall not infringe the Hill patent between the date of the execution of the agreement and its effective date except to make deliveries necessary to secure the payment of pending accounts receivable; contracts for deliveries by Smith or his Company after the effective date of the agreement shall be turned over to the Dick Company and be dealt with as it shall direct. .

■ Counsel for the amicus raises a question as to the proper construction to be given to the clause dealing with the contingency affecting the amount of money to be received by Smith. He urges that if the Hill patent had been held invalid on grounds of prior use within the time limit specified, the contingency would have had the effect of excusing payment of so much of the $100,000 as had not been paid at the time of such decision. This argument is predicated on the last sentence of the paragraph which provides that the provisions of the paragraph (c) should affect only the amount of payment "under this article 9 and shall not in any way affect any other article, provision or clause of this agreement." Article 9 includes all the promises of the Dick Company to pay money—the $90,000 in paragraph (b), as well as the $10,000 in paragraph (c). Analysis of the terms of the second agreement, which was entered concurrently with the deposit of the $90,000 in the Merchants Trust Company, is essential to a proper resolution of this question, and so I will turn to that agreement before

determining the proper construction to be given to this one.

This second agreement was made on September 12, 1927, between the Dick Company, Harry E. Smith and the Merchants Trust Company. The parties thereto agree as follows: (1) the Dick Company agrees to deposit on or before September 17, 1927, a fund of $90,000 with the Bank. That amount is to be held by the Bank in the account of Smith and is to be subject to the following payments: (2) $30,000 to become due and be paid by the Bank to Smith on January 15, 1928; the same sum on January 15, 1929, and the same sum on January 15, 1930; (3) the interest which shall have accrued is to be paid by the Bank to Smith annually on the same day that the payments provided for in article 2 *supra* are paid; (4) the Bank agrees to receive, hold, invest, and pay out the fund in accordance with the agreement; (5) deposit by the Dick Company of the $90,000 shall discharge it "* * * from any and all liability or responsibility arising from agreement or the operation thereof."

From this second agreement it is clear to me that the Dick Company surrendered all title and interest in the $90,000 upon its deposit in the Bank. Since, in addition, the payments provided for in the agreement are not conditional in any way, it is difficult to see how the provisions of Article 9 (c) in the first agreement could, in any way, be deemed to have the effect of rendering the $90,000 payment contingent. The testimony of the two surviving participants to the transaction, Smith and Seward, Smith's attorney at that time, is in accordance with this construction. Both testified, in substance, that it was their understanding that only the $10,000 payment was contingent. In addition, the plain meaning of Article 9 (c), read in its entirety, leads to the same conclusion. I conclude that the first agreement provided for payment by the Dick Company of $90,000 in any event, and of an additional $10,000 on the contingency contained in the agreement, the payment of the latter amount only being subject to that contingency.

The third agreement, made August 1, 1927, between the Dick Company, Rowe-Williams, Inc. and Joseph W. Rowe is similar to the first agreement, between Smith, the Smith Company and the Dick Company. The preliminary recitals state that the Dick Company owns the Hill patent, and the nature of the invention covered thereby; that Rowe-Williams, Inc. and Rowe have made and sold stencilizable sheets which infringe the Hill patent, but which embody "* * * certain developments of cellulose compound coating covered by said patent, * * *"; that United States patents covering these developments have been applied for and Canadian patents have been granted, all being owned "or controlled" by Rowe-Williams, Inc. They are identified as U. S. Applications, 663,001 and 746,668, both applied for by Daniel A. Williams, and Canadian patents 264,211 and 245,476, again in the name of Williams. The recital continues with a statement concerning the case then pending against Rowe and Rowe-Williams, Inc. in New Jersey, to which further reference will be made later in this opinion, and an admission by both of those parties of the validity and dominant position of the Hill patent. The recital concludes with a declaration of the desire of the parties to settle their pending litigation, and to secure to the Dick Company the benefit of the Rowe-Williams, Inc. patent applications and patents.

The mutual promises of the parties are classified under two headings. The first is *"Termination of Pending Litigation."* The provisions under this classification are to a great extent in the identical language of the Smith-Dick agreement in so far as the following are concerned: settlement of the pending litigation; turning over by Rowe-Williams, Inc. and Rowe of infringing sheets and materials and all papers in any wise relating to stencil sheets; and loyal cooperation by Rowe-Williams, Inc. and Rowe with the Dick Company, including the sending out of announcements to Rowe-Williams, Inc's. customers, "in such proper form as the Patentee may prescribe."

The agreement differs from the Smith agreements in that Rowe-Williams, Inc. and Rowe agree "* * * never hereafter, directly or indirectly, to make or sell any stencilizable material of any character for any purpose comprising a base with a coating including any cellulose compound or derivative * * * whatsoever, and not in any manner whatsoever to assist any others in any such infringement." There are no definitions similar to those in Article 6 of the Smith agreement, and no exceptions at all, in contrast to the Smith agreement, where Smith retained the right to deal in addressing machines and supplies therefor. In addition, the Rowe-Williams and Rowe agreement on this score is not limited to the life of the patent, as it was in the Smith agreement, but is perpetual.

The second classification made in the agreement is *"Transfer of Subsidiary Patents and Applications."* Here Rowe-Williams, Inc. and Rowe agree to assign the patents and patent applications described above to the Dick Company, and to assist the Dick Company to enforce the Canadian patents, as well as any patents which might be granted on the two U. S. patent applications, if the Dick Company should so request, but at the expense of the Dick Company.

In return the Dick Company agrees, in Article 6: (a) to release Rowe-Williams, Inc. and Rowe from all liability for past infringement of the Hill patent, and (b) to pay Rowe-Williams, Inc. $10,000 upon the delivery to the Dick Company of assignments of the U. S. patent applications and the Canadian patents.

The fourth agreement is one made on August 1, 1927, between the Dick Company and Rowe. It recites the nature of the Dick Company's business and its ownership of the Hill patent; that "* * * said Rowe has long been connected with the production of stencilizable sheets of different kinds and acquired valuable information and peculiar skill in connection therewith, and the stencilizable sheets with the production of which said Rowe has recently been connected, have consisted

of a base with a coating including a cellulose compound infringing said patent of the Patentee * * *" and that a decree was about to be entered or had been entered in the New Jersey suit by the Dick Company against Rowe-Williams, Inc.; that "* * * in connection with the practice of said infringement, said Rowe has developed certain ideas and owns certain applications for patents relating to details within the scope of the said patent of the Patentee, * * *" listing two patent applications, numbered 738,140 and 738,139, each for a stencil blank and process of manufacture, filed September 17, 1924 by Preston Roberts Smith; and that the parties desire to secure to the Dick Company the benefit of Rowe's information and skill and of the inventions covered by the patent applications.

Rowe then agrees to assign to the Dick Company the two patent applications described above and, if the patents should be granted, to assist the Dick Company to enforce them, at the Dick Company's expense, and the Dick Company agrees to pay Rowe $30,000 therefor.

The parties next agree that the Dick Company shall employ Rowe as a " * * * technical consultant in connection with the production of stencilizable materials, and particularly cellulose compound coatings, * * *" in accordance with the following provisions:

(a) On the request of the Dick Company, Rowe shall give the Dick Company information and advice concerning " * * * formulas, processes, manipulations and expedients of manufacture * * *" and all other details connected with "any stage" of the production of stencils, " * * * particularly upon the execution of this agreement, when it is contemplated the Patentee will request full information concerning all past experience and present ideas of said Rowe in connection with cellulose compound coatings."

(b) Rowe shall execute patent applications and assignments necessary to secure patents on any of his disclosures to the Dick Company, if the Dick Company deems them patentable and desires to secure patents thereon.

(c) The term of employment is 10 years from August 1, 1927.

(d) Rowe, throughout his employment, shall " * * * give the full benefit of his information and skill in connection with stencil sheets to the Patentee as aforesaid and shall refrain from rendering any such assistance to others, * * *" but the Dick Company will not call for Rowe's services if it will interfere with Rowe's business or occupation "not connected with stencil sheets" and " * * * shall not require him to be absent from his home or place of business without his consent and agreement as to compensation therefor first made."

Rowe agrees " * * * not to disclose to anyone except the Patentee any information whatever concerning any formula or manufacture of any stencil sheet with a coating including a cellulose compound."

(e) The Dick Company agrees to pay $135,000 or $85,000, in the event of certain contingencies described below, in ten annual payments. However, " * * * since it is contemplated that the principal value of the services of said Rowe will be received from the disclosure of his present information immediately upon the execution hereof and to avoid the possibility of dispute, it is expressly agreed that the said total sum shall be paid as hereinafter provided in consideration of the execution of this agreement, * * *" to Rowe, or his heirs if he should die before all the yearly payments have been made " * * * and shall not be withheld for any cause except the disclosure to others by said Rowe of information concerning any stencil sheet with a coating including a cellulose compound, * * *".

The Dick Company shall request Rowe's present information " * * * as it may desire, prior to September 1, 1927, and after September 1, 1927, the whole of said total sum shall be payable * * *" as follows: The sum of $8500 at the end of each year for ten years. In July 1931 the additional sum of $20,000 and the additional sum of

$5,000 a year each year thereafter, " * * * unless in July, 1931 the broad claims of said patent * * * shall have been held invalid by a Court of last resort * * * " provided that if a decision on the validity of the Hill patent has not been rendered by that time, but proceedings leading to a decision have been diligently prosecuted by the Dick Company, the additional payments will await such a decision by a Court of last resort, provided that if the decision has not been rendered at the end of the ten-year period, " * * * then at the end of said ten years said Rowe shall receive (in addition to said annual sum of Eight thousand five hundred dollars [$8,500]) the sum of Five thousand dollars for each of said ten years, it being the purpose hereof to secure to said Rowe compensation at the rate of Eight thousand five hundred dollars ($8,500) per year in any event, and at the rate of Thirteen thousand five hundred dollars ($13,500) per year for the whole period of ten years unless the broad claims of said patent shall be held invalid by a Court of last resort."

It is to be noted that this contingency differs from that in the Smith agreement in that the payment in the latter was dependent upon the patent being held invalid on the ground of prior use only, while here the contingent payments would be withheld if the broad claims of the patent were held invalid on any ground.

Much has been made of the provisions in the Smith and Rowe agreements making parts of the payments thereunder by the Dick Company contingent upon the Hill patent not being held invalid within a stated period of time; and the case of General Excavator Co. v. Keystone Driller Co., 6 Cir., 1932, 62 F.2d 48, affirmed 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293, is cited as bearing upon the propriety of such a provision.

All of the discussions of law in that case were predicated upon a finding of fact that the purpose of the transactions which were there involved was fraudulent. In order to carry out that fraudulent purpose numerous acts were done, and among those acts was the making of an agreement between a patentee and a possible prior user which contained a contractual provision similar to those in the Smith and Rowe agreements providing for contingent payments. But the finding of fraudulent purpose was not based on this contingent payment feature alone, but upon all the evidence concerning the entire transaction.

In the Keystone Driller Co. case, a patentee, Rex Downie, had heard rumors to the effect that one Bernard Clutter, had a prior use which might affect the validity of his patent. He sought out Clutter and Clutter testified in substance that Downie, at this first conference between them, recognized that Clutter had made the first embodiment of the patented invention, but pointed out that Clutter lacked funds to fight for his rights against the Keystone Driller Company, (the assignee of Downie's patent), and offered to make a deal whereby Clutter could get a little something out of his prior use. Clutter accepted the proposition, which was indefinite for some time, but contemplated the granting of a credit by Keystone to Clutter on machinery manufactured by Keystone.

Shortly thereafter Downie again visited Clutter and had him sign an affidavit describing the possible prior use as an abandoned experiment. The trial judge found that upon the signing of the affidavit the agreement which had previously been adverted to and discussed was made, and part of the contingent credit was given to Clutter shortly thereafter.

Clutter also testified that he was enjoined to keep the arrangement secret, and to many other facts which gave the transaction the aspect of a fraud.

The various explanations designed to establish that the conduct of the patentee was "innocent and innocuous" were rejected by the trial judge as inconsistent with the other evidence. Downie's claim that the substantial credit was given in exchange for Clutter's promise to assign a patent application owned by him was rejected, since there was no such patent application and Downie knew there was none before he entered the agreement. The taking of the affidavit, its contents which were contradicted

by Clutter's contemporaneous statements as well as his subsequent ones, the contingent nature of the credit granted him, the attempts to extend the period during which the credit was contingent in order to secure Clutter's silence until a decree of validity might be entered, and the efforts to disguise the nature of the credits by false entries on the books of the Keystone Driller Co. were the chief factors which precluded a finding that the transactions were "innocent and innocuous."

These facts differ sharply from those before me. Here the agreements were made with competitors of the patentee who were charged with infringing its patent. Here the consideration paid was not for an affidavit which was inconsistent with the affiant's contemporaneous statements and with the facts as subsequently testified by him, but for agreements not to compete from the patentee's two chief domestic competitors, and for the technical know-how of one of them. Here there is no testimony similar to that of Clutter in the Keystone case, nor anything which remotely resembles it. There are no false entries on the books of the Dick Company relating to these agreements, and neither Smith nor Rowe have ever testified that they were the true inventors of the stencil covered by the Hill patent. Here the facts are not only susceptible of an innocent and innocuous interpretation, but as I view them, they require such an interpretation. The essential factual basis for the conclusion that was reached as to the nature of the transactions in the Keystone Driller case is lacking here. Accordingly, the discussion concerning the contingent payments in that case is not apposite.

Furthermore, after a re-examination of the testimony and the exhibits, I am still unable to find that any physical stencil sheets or parts thereof or any other evidence was suppressed or attempted to be suppressed by anyone. There is nothing in the proofs to identify the "stencil sheet made about eight years ago in Illinois", mentioned in the "opinion" of Prindle, Wright, Neal & Bean of June 22, 1925. It has disappeared as has the little piece of stencil sheet, about three or four inches square, which Rowe testified was given to him by Father Calhoun, without identifying it as having been made at any particular time. And so it is with some of the original exhibits in the Arlac case, which were last seen in the Clerk's office. This is not strange after the lapse of so many years. Photostats of these exhibits had been preserved. The originals had been placed in an envelope which was turned over to Cox by Seward and produced by Cox at the time Smith's deposition was taken in the Arlac case. I am unable to find that these papers were in any way tampered with. Nor is there any evidence to justify the conclusion that the "stencil sheet" of the Prindle, Wright, Neal & Bean report, or the little sample furnished to Rowe by Father Calhoun at their only interview together, so far as Rowe could recall, were purposefully done away with.

In order to implement the settlements with Rowe and Smith certain court proceedings were had. Upon the above described withdrawal of the answer and amended answer in the action pending in this Court against Hesco a decree *pro confesso* was entered on consent, the Dick Company waiving an accounting. A few days before the entry of this decree, on July 16, 1927, a complaint was filed, in a new action in the District Court for the District of New Jersey, against Smith and the H. E. Smith Co.; an answer which made no reference to the Smith and Calhoun prior uses was filed and on September 15, 1927 a final decree for an injunction was entered, on consent. The action against Barnett having been dismissed as above stated, the Dick Company, on July 16, 1927, filed a complaint in a new action against Rowe and Rowe-Williams, Inc., also in the District Court for the District of New Jersey; no answer was filed; and on August 5, 1927, a final decree for an injunction was entered on consent. It appears not to be disputed that in the various negotiations, the making of the contracts and the entry of these decrees, neither Smith nor Rowe was cognizant of what was being done by the other. Each was completely eliminated as a competitor of the Dick Company.

It is charged in the Notice of Issue filed by the amicus that shortly after the making of the agreements with Smith and Rowe the Dick Company employed Seward, who had been Smith's attorney for many years and Dr. Edward C. Worden, a chemical expert in the field of cellulose, who had done considerable work for Rowe. It is claimed that Dr. Worden was under retainer to assist the Simplicator Corp. in its defense of the infringement action brought by the Dick Company and that he was induced to return the retainer he had received from Simplicator and thereafter joined forces with the Dick Company. As Seward had personal familiarity with the work of Smith and as Dr. Worden must have known a good deal about Rowe's activities in the stencil field, the employment of these two men is said to be part and parcel of the alleged scheme to suppress evidence of the Smith and Calhoun prior uses.

■ With respect to the last of these contentions, it should suffice to say that there is no evidence of any kind before me to show that the Dick Company caused Dr. Worden, who died some years ago, to return the retainer fee and sever his connection with Simplicator. Indeed, there is nothing to indicate that the Dick Company was aware, at the time that Dr. Worden returned the retainer fee, that he had been retained by Simplicator, although Cox was aware that Dr. Worden "had recently been approached by or received a check designed to cover a retainer from" Simplicator.

■ In the absence of some showing of disloyalty to Smith or Rowe, which is nowhere shown in this record, it is hard to discover any impropriety in the acceptance by them of employment by the concern to whom their former employers had sold out, in the absence of participation by them in some scheme to suppress evidence; and I am persuaded that there was no such scheme.

■ It has also been claimed that there was some impropriety in the making by Seward of an affidavit on January 11, 1930 in the Simplicator case, wherein he stated what he knew about Smith's alleged prior use. The factual matter in the affidavit has not been shown to be false in any way; portions of it are corroborated by persuasive, contemporaneous evidence. Nevertheless, it is contended that Seward should have revealed to the Courts to which the affidavit was submitted that he was then actively engaged in assisting Cox, counsel for the Dick Company.

As a matter of fact, Cox stated on the record during the taking of Smith's deposition that Seward was then employed by him and this deposition and the affidavit in question were both before the Courts which considered the question of alleged suppression of evidence. If it was important that the attention of these Courts be specifically directed to Seward's relationship with Cox, one would have expected this to be done by counsel for Simplicator or Heyer, since they, of course, knew of the existence of the relationship. This was not done. If the matter was thought to be unworthy of attention in 1930, I do not see how it becomes important now. Moreover, I was impressed with the credibility of Seward while he was testifying at this proceeding, and with the corroboration of his 1930 affidavit upon which I have already commented.

The chronological sequence of events now brings us back to the Simplicator case. On January 9, 1928, the depositions of Father Calhoun, and various persons who were said to have knowledge of his work, were filed. The case was tried before Judge Winslow in February, 1928, and on January 22, 1929, he filed his opinion sustaining the Hill patent in all respects and finding that the evidence was insufficient to establish the Calhoun prior use. Judge Winslow rejected this defense not merely because "there is no physical record remaining," but also because there was "no evidence that the experimental stencil sheets could be stencilized long after manufacture without moistening, or were operable long enough for practical commercial use." A. B. Dick Co. v. Simplicator Corporation, D.C.S.D.N.Y.1929, 30 F.2d 713, 715. The then Circuit Court of Appeals for the Second Circuit affirmed, with modifications not important here, on July 8, 1929. The Calhoun prior use was again rejected

and for similar reasons, among others. A. B. Dick Co. v. Simplicator Corporation, 2 Cir., 1929, 34 F.2d 935.

Having obtained this adjudication of the validity of the Hill patent, the Dick Company was quick to follow it up with a series of new actions for infringement. On July 26, 1929, in Pittsburgh, it sued Arlac, Simplicator's supplier, which had undertaken and prosecuted the defense of the action against Simplicator. On August 7, 1929, in this Court, it sued the Shallcross Company; and on the same day it commenced against the Marr Duplicator Co., the defendant herein, the action in which these present proceedings are had, over twenty years later. On August 26, 1929, it sued Heyer in Chicago.

In the case against Arlac, in the case against Heyer, and in this case, the defendants in their answers charged the Dick Company with fraud and suppression of evidence in connection with its settlements with Smith and Rowe in 1927. In all three of these cases (Arlac, Heyer and Marr) the defendants sought to obtain copies of the contracts of settlement by interrogatory, but in each case the Dick Company declined to produce them, on the ground that they were private papers "not in any wise affecting the defendant or this cause." In the Arlac and Heyer cases, motions to produce were made by the defendants, and in each case the motion was denied.

Depositions were taken in the Arlac case of Smith, Rowe and A. B. Dick, Sr., President of the Dick Company. On the basis of these depositions, counsel for Arlac moved on January 8, 1930 before the Second Circuit Court of Appeals for a recall and modification of the mandate in the Simplicator case on the ground, in substance, that Smith had a valid prior use, evidence of which the Dick Company had fraudulently suppressed. On January 30, 1930 the Circuit Court filed a memorandum opinion denying the motion on the ground that "no prior use could be proved beyond a reasonable doubt," and on the further ground of lack of due diligence in failing to discover the supposed prior use before the trial.

The cases against Arlac and Heyer thereafter went to judgment and the Dick Company was successful in both. Both judgments were affirmed on appeal, the former on February 17, 1931 and the latter on June 23, 1932. Arlac Dry Stencil Corporation v. A. B. Dick Co., 3 Cir., 1931, 46 F.2d 899; Heyer Duplicator Co. v. A. B. Dick Co., 7 Cir., 1932, 59 F.2d 787.

Finally, the case against Marr came to trial. The defendant did not rely on the claims of fraud and suppression which had been set forth in its answer, perhaps because of the fate those defenses had suffered in the cases against Arlac and Heyer. The issue litigated was whether the Marr stencil infringed the Hill patent. Judge Patterson held on June 2, 1932 that it did; and on June 15, 1932 the injunction and accounting previously adverted to were ordered. The subsequent history of the case is detailed at the beginning of this opinion.

In the case against Arlac the deposition of Smith was taken on December 2, 1929 and on January 6, 1930. In the course of the deposition, counsel for Arlac requested Smith to produce the settlement agreements, and Smith declined to do so, as did Cox, counsel for the Dick Company. Subsequently, on February 27, 1930, counsel for Arlac made a motion to produce, but the motion was denied by Judge McVicar after hearing oral argument and without opinion.

In the meantime, the same question was presented to Judge Carpenter in the Heyer case, in the form of objections to interrogatories which called for the production of the agreements. And on December 30, 1929, again after oral argument and without opinion, Judge Carpenter refused to compel production and sustained the objections of counsel for the Dick Company to the interrogatories.

A third effort to obtain the agreements was made in connection with the motion in the Circuit Court of Appeals for the Second Circuit in the Simplicator case, previously described, wherein the Court declined to order the case reopened.

99 of the judges

Apparently none of the judges involved saw or desired to see the documents in question. In the Arlac case, counsel for the Dick Company had the documents in court at the trial and indicated his willingness to hand them up to Judge McVicar should he wish to examine their contents; but Judge McVicar declined, and did not order production.

■■ No claim of fraud can be made out on a record of this nature. It is idle to call this "concealment" and "suppression." In each case there was a litigated motion, a ruling on the question, and either abandonment of the point by the losing party, or affirmance of the trial judge's decision on appeal. Evidence cannot be held to have been fraudulently suppressed merely because a trial judge rules that it need not be produced on a motion seeking production. Any other rule would open the door to endless litigation.

■ It is claimed that the trial judges were induced to rule as they did by virtue of misrepresentations of fact by counsel. But I find no misrepresentations of fact. A statement by counsel in the course of argument or of a party in response to an interrogatory that certain evidence is "irrelevant, incompetent and immaterial" and that it has no probative force in the case, is legal argument. If such argument constitutes fraud upon the courts, the courts are being defrauded every day.

■ That these agreements in the hands of competitors could have been put to a use highly prejudicial to the interests of the Dick Company and having no bearing on the issues before the courts is obvious. Nor is there reason to doubt that Smith and Rowe had some justification for the belief that the amounts they received were matters of concern to them only. If a lawyer or a layman states in open court that a document, which is either present in the courtroom or readily subject to judicial control, has nothing to do with the case and that he will not produce it to his adversary unless ordered to do so, it is hard to see where there is to be found in such conduct a fraud upon the courts.

■ It is contended, nevertheless, that some of the statements by Cox transcended the bounds of legal argument and were designedly made to deceive the court. The statement chiefly relied on is that of Cox, in his brief filed in the Simplicator case with the Circuit Court of Appeals for the Second Circuit, in opposition to the motion to reopen and remand, to the effect that the Dick Company had no "control over" Smith. It is argued that the contingent phase of the contract gave the Dick Company a strangle-hold on Smith and that it was nothing short of a flat misrepresentation of fact to state that it had no "control over" him.

When one examines the papers submitted to the Circuit Court in support of the petition to reopen and remand, however, including the affidavit of Jo. Baily Brown, it appears that it was asserted that several "futile attempts" had been made to locate Smith or obtain information of his whereabouts and the intimation is plain that the Dick Company had something to do with the physical absence of Smith from his home and thus some control over his goings and comings. Accordingly, and by way of response to this charge, Cox states in his brief: "The plaintiff, since the agreement in 1927, has had no connection or contact with, or control over, Smith whatsoever. So far as we are informed, he has been continuously residing at his home and reachable at any time; and whether he has or not, has nothing whatever to do with the plaintiff."

Thus viewed in its context the statement is not by any stretch of the imagination misleading. Nothing in the evidence before me indicates that the Dick Company ever had anything to do with the physical movements of Smith or any knowledge thereof.

I have examined each and every one of the answers to interrogatories and the various briefs and memoranda prepared by Cox and submitted by him to the various courts before which the question of the production of those agreements was debated and can find no evidence therein of any intent to deceive. Nor can I find in

any of the objections made by Cox to questions addressed to witnesses, whose testimony was being taken by deposition or otherwise, any evidence of wilful deception or fraud on the courts.

 There remain for consideration a number of answers, particularly those of Smith, given in response to questions propounded during the taking of depositions in the Arlac case, which are said to be perjurious and false. Thus Smith denied that any part of the consideration that "passed" to him in connection with his settlement with the Dick Company was "contingent upon future developments"; and he also denied that he was directly or indirectly receiving compensation from the Dick Company "for something." His testimony before me is that he thought the reference to "compensation" was intended to apply to something beyond and apart from the agreement and the context of this portion of his deposition would seem to make that inference a reasonable one. At the time of the taking of his deposition he was not in any way in the employ of the Dick Company or performing on their behalf any services for which he was in receipt of remuneration of any kind. And as to the consideration which had already "passed" to him, namely the $90,000 which was paid to the Bank for his account pursuant to the agreement already referred to, there was no contingency whatever. In any event, Smith testified before me that he might have misunderstood the question but that he thought counsel was trying to bring out that he got "something extra" from the Dick Company, and he was trying to say that he got "nothing else out of it" but what was provided in the agreement.

The refusals by Smith and Rowe to produce the agreements or testify with respect to their contents on the ground that they were private and personal matters would seem to require no further comment, even if such refusals were to some extent based on the objections voiced at the hearings by Cox. Such situations arise continually in connection with pre-trial discovery proceedings and it is sufficient to say that the matter was formally presented to the court for determination and the objections were sustained.

There remain a multitude of miscellaneous details which it would be a work of supererogation to pursue further. The problem throughout has been to fit all the attendant circumstances into a factual pattern which in effect constitutes the answer to the question propounded by the Supreme Court. Matters affecting the credibility of witnesses and various minutiae have been assimilated into the broad conclusions of fact already adverted to. I find no fraud of any kind.

Moreover, the same result was reached when substantially the same question was presented to the Court of Appeals for the Seventh Circuit by petition to vacate the judgment in the Heyer case. It is significant that this application was made in September 1948, long after the Supreme Court had remanded the case for investigation of the alleged fraud upon the courts. All that was before the Supreme Court was the suggestion of the Solicitor General, based upon the allegations of suppression of evidence made in the then undisposed of anti-trust proceedings. But the evidence submitted in abbreviated form to the Court of Appeals for the Seventh Circuit was much the same as here, although no witnesses were heard. The charges of suppression of evidence, fraud and deception of the courts, based largely on the Smith and Rowe agreements, the employment of Seward by the Dick Company and so on, were the same. After extended oral argument the Court of Appeals took the matter under advisement, and, on February 23, 1949, the proceeding was dismissed, without opinion. This result is not surprising when one considers that these charges in one form or another had been asserted in various pleadings in a whole series of cases involving the validity of the Hill patent, from as early as the date of filing of the answer in the Arlac case on August 31, 1929; but, in every one of these cases, the charges were abandoned by the party making them or rejected by the court for insufficiency of proof to sustain them.

The civil anti-trust proceedings in Cleveland, which were mentioned in the preliminary portion of this opinion, terminated in 1948 in a consent decree against the Dick Company " * * * without trial or adjudication of any issue of fact or law herein and without admission by any party in respect of any such issue." And the Dick Company at the same time pleaded nolo contendere to the indictment, which charged numerous violations of the anti-trust laws, among which was the charge that the Dick Company did conspire with others to " * * * acquire and suppress evidence relating to the validity of certain key patents employed in furtherance of the combination and conspiracy." These allegations are amplified in other parts of the indictment but nevertheless constitute but a very small part of the charges contained in the indictment against the Dick Company.

The fact that the plea was made has been submitted as evidence bearing directly upon the merits of the charges now before me, not merely as historical background.

■ The general rule is that a plea of nolo contendere is no more than an implied admission solely for the purpose of the case in which the plea is made, and is not admissible as an admission in a subsequent civil suit based on the same conduct. Twin Ports Oil Co. v. Pure Oil Co., D.C.Minn. 1939, 26 F.Supp. 366, and cases cited and discussed at 376–378; Alden-Rochelle, Inc. v. American Society of Composers, Authors and Publishers, D.C.S.D.N.Y.1942, 3 F.R.D. 157; IV Wigmore on Evidence § 1066, and cases cited in footnote 4 (3d ed. 1940).

■ The plea is a device which the courts, in their discretion, make available to defendants in certain criminal cases so that a judgment may be entered in favor of the government without requiring the defendant expressly to admit the charges made against him, and without requiring proof of the charges made.

■ The fact that the plea was made is noted as part of the background of this proceeding, but the plea has no other probative significance.

The amicus has called upon counsel for the Dick Company to produce certain documents which assertedly are relevant to the charges now before me. Counsel have declined to produce the documents, and quite properly so, in view of the claim that the documents are protected from disclosure by the privilege arising out of the attorney and client relationship.

■ It is clear that the assertion of the claim of privilege can give rise to no adverse inferences. VIII Wigmore on Evidence § 2322 (3d ed. 1940). This is so, irrespective of the nature of the proceedings in which the claim is made, since every conscientious lawyer is duty-bound to raise the claim in any proceeding in order to protect communications made in confidence.

The attorney-client privilege has long been recognized as essential to a proper administration of justice. An early expression of the reasons which gave rise to this important obligation upon lawyers is stated in Annesley v. Earl of Anglesea, 17 How.St.Tr. 1225 (1743), where it was said:

" * * * formerly persons appeared in court themselves; but as business multiplied and became more intricate and titles more perplexed, both the distance of places and the multiplicity of business made it absolutely necessary that there should be a set of people who should stand in the place of suitors, and these persons are called attornies. Since this has been thought necessary, all people and all courts have looked upon that confidence between the party and attorney to be so great that it would be destructive to all business if attornies were to disclose the business of their clients. * * * If an attorney had it in his option to be examined, there would be an entire stop to business; nobody would trust an attorney with the state of his affairs. The reason why attornies are not to be examined to anything relating to their clients or their affairs is because they would destroy the confidence that is necessary to be preserved between them. This confidence between the employer and the person employed, is so

102

sacred a thing, that if they were at liberty, when the present cause was over that they were employed in, to give testimony in favor of any other person, it would not answer the end 'for which it was instituted. The end is, that persons with safety may substitute others in their room; and therefore if you cannot ask me, you cannot ask that man; for everything said to him, is as if I had said it to myself, and he is not to answer it."

Substantially the same thought is expressed by L. C. Brougham in Greenough v. Gaskell, 1 Myl. & K. 98, 103 (1833):

"The foundation of this rule is not difficult to discover. It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection * * *. But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of all judicial proceedings."

Since these early statements the necessity of protecting the attorney-client relationship has become even more apparent; the legal rights and duties of large corporations and those who dispute with them would not be susceptible of judicial administration in the absence of lawyers, nor, in the absence of the privilege could lawyers properly represent their clients. I am, frankly, hesitant to do anything which would contribute to the undermining of the protection afforded by the time-honored rule which excludes from evidence such confidential communications.

■ Nevertheless, it is quite clear that the privilege disappears if it is invoked merely to cloak a fraudulent scheme, and that when a client consults an attorney as to how to concoct or perpetrate a fraud the privilege is unavailing. VIII Wigmore on Evidence § 2298 (3d ed. 1940); United States v. Bob, 2 Cir., 1939, 106 F.2d 37. Perhaps in some cases a mechanical rule may suffice, as where in a jury case and

perhaps in some others, it can be said that a prima facie case of fraud or criminal conspiracy has been made out. But under the peculiar circumstances of this rare and unusual proceeding, I thought it wiser to pursue a different course. Accordingly, at various stages of the trial the question of privilege was argued *in extenso* and I kept the point open even after the evidence was closed, so that, had my suspicions been aroused and had there formed in my mind a substantial doubt as to whether or not the charges were true, I could rule against the privilege, receive the documents and obtain such enlightenment therefrom as might be forthcoming.

■ The opening statements of counsel were most comprehensive and consumed seven full days of the time of the Court, during which many of the documents later to be offered in evidence were examined. The impression that the Smith and Rowe settlements were made for the purpose of buying out potential competitors and not as part of a conspiracy to suppress evidence of the Smith and Calhoun prior uses was confirmed by the credible testimony of Smith and Seward, the first two witnesses. Under these circumstances, and in the absence of any witness who testified to the making of a corrupt arrangement, it seemed to me that it would be wrong to require the production of the documents because of the theoretical possibility that some other trier of the facts might take a view of the proofs different from my own. As the record will indicate, my early impressions were confirmed as the case went on and nothing which has come to my attention during the deliberations which have culminated in this opinion has served to change them. And so I decide now, and for the last time, that the documents need not be produced.

Counsel for the amicus have performed a distasteful task with rare fidelity and indefatigable industry. Their assistance has been invaluable; and they have the thanks of the Court.

■ As I have found that there was no conspiracy, the motion to strike certain evidence, which was received subject to the finding that a conspiracy existed as alleged,

is granted and such evidence is hereby stricken.

The findings of fact appear in this opinion and no further findings will be made. The question propounded by the Supreme Court is answered in the negative.

An appropriate order will be entered.